IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

_____

LAWRENCE TRAVIS,

               Plaintiff,                             OPINION AND ORDER

      v.                                          14-cv-199-wmc

THE CITY OF MADISON,
DEPARTMENT OF TRANSPORTATION,
TRANSIT DIVISION,

               Defendant.

_____

Plaintiff Lawrence Travis claims that his former employer, the City of Madison, Department of Transportation, Transit Division (the "City"), violated the Family and Medical Leave Act ("FMLA"), 28 U.S.C. § 2601 *et seq.*, by (1) interfering with his FMLA rights and (2) retaliating against him for requesting FMLA leave. The City has moved for summary judgment on both claims. (Dkt. #8.) Disputes of fact preclude the entry of summary judgment on Travis's interference claims, but the court will grant summary judgment to the City on Travis's retaliation claim.

UNDISPUTED FACTS[1]

I. **Background**

The City employed Travis as a bus driver for its Madison Metro operations. (Def.'s PFOF (dkt. #10) ¶ 1.) During the relevant period, the City was also an

---

[1] Except as otherwise noted, the court finds the following facts to be material and undisputed for purposes of summary judgment and views them in the light most favorable to Travis as the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

"employer" and plaintiff its "employee" within the meaning of the FMLA.  (*Id.* at ¶ 2.) Throughout his employment with the City, Travis was part of a collective bargaining unit represented by Teamsters Union Local 695 ("the Union").  (*Id.* at ¶ 3.)  The Union and the City negotiated a collective bargaining agreement that included terms regarding attendance expectations and progressive discipline.  (*Id.* at ¶¶ 4, 5.)  The City also established an Administrative Procedure Memorandum, which described disciplinary measures for unexcused or excessive absenteeism.  (*Id.* at ¶¶ 6, 7.)

According to the City, it had also adopted a formal procedure that all employees must follow to claim FMLA leave.  For example, employees must submit a written application and a medical certification for each medical basis that qualifies the employee for FMLA leave.  (*Id.* at ¶ 9.)  Formal applications are reviewed by the City's Human Resources Department.  (Brad Wirtz Decl. (dkt. #21) ¶ 4.)  According to the City, its procedures are "necessary because the City has more than 3,000 employees," making it "impossible for the City to determine whether an employee intended to use FMLA leave and qualified for such leave without the formal application requirements."  (*Id.* at ¶ 5.)

## II.   Travis's History of FMLA Requests and Initial Five-Day Suspension

Beginning in May 2010, Travis requested, and the City generally approved, excused time off under the FMLA.  (Def.'s PFOF (dkt. #10) ¶ 8.)  Before approving Travis's FMLA requests, the City required Travis to fill out an application for the requested leave and submit medical certifications justifying his request for FMLA leave. (*Id.* at ¶ 9.)  Before March of 2013, Travis also admits applying for FMLA leave

consistent with defendant's formal procedure by filling out an application for leave and submitting medical certifications.  (*See* Pl.'s Resp. DPFOF (dkt. #14) ¶¶ 8-9.)[2]

The City disciplined Travis under its excessive absenteeism policy for absences that were not covered by the FMLA requests.  (*Id.* at ¶¶ 10-12.)  Pursuant to the collectively bargained, progressive disciplinary policy, the City issued Travis three disciplinary measures for unexcused absences: (1) a verbal warning on August 18, 2011; (2) a written warning on December 9, 2011; and (3) a one-day suspension in February 2012.  (*Id.* at ¶ 11.)  Travis does not dispute this portion of his disciplinary history.[3]

On an additional two occasions, after the City approved his FMLA request, Travis failed to recertify the medical certifications justifying his leave.  (*Id.* at ¶¶ 14, 15, 18.)  This, too, is not disputed, nor is the fact that his failures to recertify resulted in unexcused absences.  (*Id.* at ¶ 18.)  One of these occasions included an approval for FMLA leave between May 10, 2012, and May 6, 2013.  (Gregory Leifer Aff. Ex. C (dkt. #11-3).)

With respect to that leave, the City required Travis to recertify his medical status by November 11, 2012, to maintain approval for approximately six more months of FMLA leave.  (*Id.*; *see also* Pl.'s Resp. DPFOF (dkt. #14) ¶¶ 17-18.)  When he did not,

---

[2] Still, as discussed below, Travis maintains that the application was not actually *necessary* and that he was only required to complete a "Certification of Sick Days Used" form and provide medical documentation to comply with the City's procedures.  (Pl.'s SPFOF (dkt. #15) ¶ 13.)

[3] It is not clear that *all* of the absences for which the City disciplined Travis related to FMLA-based leave.  For example, Travis could have missed work simply because he did not show up, as opposed to missing work for FMLA-qualifying (but not approved) reasons.  Regardless, the fact remains that Travis had extensive experience with the City's FMLA procedures and was disciplined for each absence not covered by an FMLA request.

there is no dispute that the City imposed a five-day working suspension pursuant to its FMLA and absenteeism policies.  (Pl.'s Resp. DPFOF (dkt. #14) ¶¶ 60-63.)

## III.    Partner's Terminal Illness

Tragic circumstances involving Travis's partner, who was the mother of his children, gave rise to many of Travis's FMLA requests.  Doctors diagnosed her with a terminal illness in 2012.  (Pl.'s SPFOF (dkt. #15) ¶ 2.)  Travis requested FMLA leave to cope with his partner's condition and to care for their children during this difficult time.

The City had previously made Travis aware that he was required to submit FMLA applications for such leave.  For example, on February 4, 2013, Travis submitted medical certification to care for the emotional needs of his children due to their mother's illness, but he failed to file the required FMLA application.  (*See* Leifer Aff. Ex. D, E (dkt. #11-4, -5).)  On February 11, the City responded with a formal letter requesting that he fill out an application, which was apparently enclosed.[4]  (*Id.* at Ex. E (dkt. #11-5).)  At that time, the City further informed Travis that "any and all absences" would be recorded as FMLA leave if he qualified for such leave and submitted the application.   (*Id.*) Completion of the application would "allow any leave time taken from the date of the medical certification to be recorded and charge[d] as FMLA."  (*Id.*)

---

[4] Specifically, the letter read in relevant part: "The City of Madison Human Resources department is in receipt of medical certification as of February 1, 2013 from your health care provider.  We have yet to receive a completed Family and Medical leave application for this medical certification. . . . A City of Madison Family and Medical leave application is enclosed. Please complete the form and secure your department[']s approval if you wish to have the health care provider's certification process."  (Leifer Aff. Ex. E (dkt. #11-5).)

On February 12 and 13, Travis submitted the required applications -- one to care for his own needs and one to care for his children's.  (*Id.* at Ex. F, G (dkt. #11-6, -7).)  On the accompanying medical certification, however, the physicians could not predict how many days per month Travis would take his leave if approved.  (*Id.* at Ex. G (dkt. #11-7).)  As a result, the City sent a letter to Travis's physicians on March 14, seeking further information on "the specific number of days that Madison Metro and the City may expect Mr. Travis to need intermittent leave in any given month."  (*Id.* at Ex. H, J (dkt. #11-8, -10).)  On April 12, Travis's physician, Dr. Richard DeWitt, restated that he could "not predict how many days" Travis would need to miss work.  (*Id.* at Ex. J (dkt. #11-10) 2.)  As a result, the City denied Travis's applications.  (*Id.* at Ex. I (dkt. #11-9).)

## IV.    Travis's March Absences and Progressive Ten-Day Working Suspension

On March 11, 2013, Travis's daughter fractured her ankle.  (Pl.'s SPFOF (dkt. #15) ¶¶ 3, 4.)  With the approval of his supervisor, Travis left work to accompany his daughter to the hospital.  (*Id.* at ¶ 3.)  Travis missed work on March 12 and 13 to care for his daughter.[5]  (*Id.* at ¶¶ 6-7.)

On March 14, Travis submitted a "Certification of Sick Days Used" form, indicating that he had FMLA leave and missed work to care for his daughter.  (*Id.* at ¶ 8.)  Travis also submitted a letter from a UW Health doctor certifying the fact that Travis would need to miss work to care for his daughter.  (*Id.* at ¶ 9.)  Travis did not, however,

---

[5] Travis also missed work on March 29, 2013, but the parties agree this absence was not subject to an approved FMLA request.  (Pl.'s Resp. PFOF (dkt. #14) ¶ 71.)  Travis does not contend on summary judgment that the March 29 absence and resulting discipline give rise to an interference claim.

complete a formal application for FMLA leave.  (*See id.* at ¶ 9; Def.'s Reply DPFOF (dkt. #17) ¶ 37.)   Based on this failure, the City imposed a ten-day working suspension for Travis's absences on March 11, 12, and 13, again pursuant to the progressive disciplinary policy.  (Def.'s Reply PFOF (dkt. #17) ¶¶ 72-73.)

## V.   FMLA Application Requirement

The parties dispute whether Travis provided sufficient documentation to request FMLA leave by filing the "Certification of Sick Days Used" form and the letter from UW Health.  (*See* Pl.'s SPFOF (dkt. #15) ¶ 13; Def.'s Resp. PSPFOF (dkt. #18) ¶ 13.)   In particular, Travis maintains that on occasion the City accepted this certification form and the letter, and did not request that he provide any further medical documentation or complete any other forms.  (Pl.'s SPFOF (dkt. #15) ¶ 13.)   According to Travis, he provided sufficient documentation to comply with the City's procedures for requesting FMLA leave.  (*Id.*)

Travis also notes that the City accepted a "Certification of Sick Days Used" as sufficient documentation for excusing an absence on March 18, 2013, based on FMLA leave to accompany his daughter to the hospital to have her cast changed. (*Id.* at ¶¶ 16-17.)   In response, the City disputes that it excused Travis's March 18 as FMLA leave. (Def.'s Resp. PSPFOF (dkt. #18) ¶ 17.)   According to the City, Travis had available sick leave to cover his March 18 absence.[6]  (*Id.*)   The City admits, however, that its database documents this absence as "corrected from 310, corrected from no FMLA."  (*Id.*)

---

[6] For this reason, the City maintains that Travis's March 18 absence was not covered by FMLA leave, but did not give rise to any disciplinary proceedings.  (*Id.*)

On May 1, 2013, the City and Travis held an absent without pay ("AWOP") meeting.  (Def.'s Resp. PSPPOF (dkt. #18) ¶ 14.)  At this meeting, the City informed Travis that the March absences were not covered by his FMLA leave.  (*Id.*)  According to the City, it notified Travis that if he completed the formal application, and if the City approved that application, it would expunge the ten-day working suspension from his record.  (*Id.*)  According to Travis, however, the City merely informed him that "FMLA leave would not be granted" for the absences and that he would be disciplined.  (Pl.'s SPFOF (dkt. #15) ¶ 14.)  For his part, Travis expressed the belief that he had already complied with the City's procedures by submitting a "Certification of Sick Days Used" form and a letter from his daughter's treating physician at UW Health.  (Lawrence Travis Decl. (dkt. #16) ¶ 13.)

According to the City, it again notified Travis of the incomplete application at a meeting on August 5, 2013.  (James Lehman Decl. (dkt. #20) ¶ 21.)  Specifically, the City maintains that Travis was told if he filled out an FMLA application for his March 11-13 absences and that application was approved, the ten-day working suspension would be expunged from his employment record.  (*Id.*)  According to Travis, however, "[a]t no point after May 1, 2013, did any of Defendant's representatives ask [him] to complete the formal application for FMLA for [his] absences on March 11-13, 2013." (Travis Decl. (dkt. #16) ¶ 15.)

## VI.    Travis's Summer Absences and Termination

On May 1, 2013, Travis *did* submit two applications for FMLA leave for other absences.  The first was to take care of his children as their mother -- and his partner --

battled terminal illness.   The second was for personal time off, also related to his partner's illness.

Dr. Amy Plumb certified the medical basis for Travis's FMLA leave request. (Leifer Aff. Ex. L (dkt. #11-12) 1-4.)   Due to a mistaken date indicating when leave was to begin, however, Dr. Plumb submitted two certifications.   (*Id.*)   Dr. Plumb stated on both certifications that the "[p]robable [d]uration of [c]ondition" was "terminal."   (*Id.* at 1, 3.)   On the form with the correct starting date, the portion to be completed by Travis indicated that the expected duration of *leave* was "6 months."   (*Id.*)[7]

The City granted both requests on May 10, 2013.   (Leifer Aff. Ex. O, P (dkt. #11-15, -16).)   The letter granting Travis's May 1, 2013, FMLA request to care for his children is central to this dispute.[8]   The letter states, in pertinent part:

> Employee application for intermittent family and medical leave as of 5/1/2013 is approved as per medical dated 4/29/2013.   Leave is for the care of a family member per medical certification.   Intermittent leave will be in effect from 4/30/2013 *until 6/29/2014* due to the medical certification lacking an end date. . . .   Employee needs to recertify ongoing
>
> treatment and continued need for intermittent leave to Human Resources *by 6/29/2013.*

(Leifer Aff. Ex. O (dkt. #11-15) 2 (bolding and underlining removed; emphasis added).) The italicized "6/29/2014" date was an error; the City later issued a second letter to

---

[7] The parties dispute the significance of Travis's statement on the expected duration of his leave. The City argues that only Dr. Plumb's statement on the expected duration of the illness is relevant for recertification.   (Def.'s Br. (dkt. #9) 13.)   Travis argues that the "6 months" is the relevant statement on the expected duration of the leave.   (Pl.'s Br. Opp'n (dkt. #13) 17.)

[8] The City's approval of Travis's request for leave for his own health condition correctly stated that the approval was in effect from April 30, 2013, to June 29, 2013, and that Travis would need to recertify an ongoing need by June 29, 2013.   (Def.'s Reply PFOF (dkt. #17) ¶ 35; Leifer Aff. Ex. P (dkt. #11-16).)

Travis, in an attempt to clarify that the approval was actually effective until June 30, 2013. (Leifer Aff. Ex. Q (dkt. #11-17).) The City's second letter indicated that the FMLA approval was "effective from February 13, 2013 until June 30, 2013." (*Id.*) It did not, however, specifically mention the previous "6/29/2014" date provided in the approval letter. Travis contends that the City never explicitly informed him that the "6/29/2014" date was a typographical error. (Travis Decl. (dkt. #16) ¶¶ 19-22.) If the City had told him that the FMLA leave request to care for his children actually ended on June 29, 2013, Travis maintains that he would have sought recertification, just as he did for his personal leave request. (*Id.* at ¶ 27.)

For each absence in July and August, Travis submitted a "Certification of Sick Days Used," noting the purpose was to care for his children. (*Id.* at ¶ 28.) According to Travis, he believed these absences were covered because FMLA leave for this purpose had apparently been approved through June 29, 2014. (*Id.* at ¶ 29.) Because Travis had not recertified the medical basis for his FMLA leave based on his *children's* needs by June 29, 2013, however, the City did not excuse Travis's absences. (Leifer Aff. (dkt. #11) ¶¶ 48-57.) As a result of Travis's five absences in July and August, the City terminated his employment on November 1, 2013. (Def.'s PFOF (dkt. # 10) ¶ 89.) Before termination, the City did not inform Travis that his July and August absences were not covered because he had failed to recertify timely. (Pl.'s SPFOF (dkt. # 15) ¶ 31.)

In this lawsuit, Travis principally claims that the City wrongfully interfered with his right to FMLA leave during March, July and August of 2013. He also claims that the City retaliated against him for requesting FMLA leave.

9

OPINION

Summary judgment is appropriate if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Factual disputes preclude summary judgment only if the "facts might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. The party moving for summary judgment bears the initial burden of showing that there is no genuine issue of material fact and that it is entitled to relief. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Once this initial burden is met for an issue on which the nonmoving party will bear the burden of proof at trial, the nonmoving party must "go beyond the pleadings" and "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal quotation marks omitted). The nonmoving party may not "simply show some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Nor may the nonmoving party "merely rely on conclusory pleadings" to withstand the motion. *Colan v. Cutler-Hammer, Inc.*, 812 F.2d 357, 361 (7th Cir. 1987). Rather, the nonmoving party must produce "evidence . . . such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If he fails to do so, "[t]he moving party is 'entitled to a judgment as a matter of law.'" *Celotex*, 477 U.S. at 323 (quoting Fed. R. Civ. P. 56(c)).

Here, Travis has come forward with sufficient evidence to survive summary judgment with respect to his interference claims against the City, but he has not come

forward with sufficient evidence to support a finding of retaliation for seeking FMLA leave.

I.   **Interference**

   A.  **FMLA Claims Regulations and Law**

Under the FMLA, eligible employees are entitled to up to twelve workweeks of leave during a twelve-month period where the employee has a serious health condition that renders him unable to perform the functions of his position or where the employee must care for his spouse, child or parent, if the spouse, child or parent has a serious health condition.   29 U.S.C. § 2612(a).   The FMLA permits an employee to take intermittent leave.   *Id.* at § 2612(b).  The FMLA further provides that employers may not "interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under [the Act]."   *Id.* at § 2615(a)(1).  An employee "need not expressly assert rights under the FMLA or even mention the FMLA" to invoke his rights under the Act. 29 C.F.R. § 825.303(b); *Burnett v. LFW Inc.*, 472 F.3d 471, 478 (7th Cir. 2006).

To prove an FMLA interference claim, an employee must show that his employer deprived him of an FMLA entitlement.   *Ridings v. Riverside Med. Ctr.*, 537 F.3d 755, 761 (7th Cir. 2008) (citing *Burnett*, 472 F.3d at 477).  In particular, the plaintiff must prove that: (1) he was eligible for the FMLA's protections; (2) the employer was covered by the FMLA; (3) he was entitled to take leave under the FMLA; (4) he provided sufficient notice of his intent to take leave; and (5) the employer denied him FMLA benefits to which he was entitled.   *Jones v. C & D Techs., Inc.*, 684 F.3d 673, 677 (7th Cir. 2012).

The parties do not dispute that the City is an employer covered by the FMLA or that Travis was an eligible employee.  Since it is undisputed that the City fired Travis because of his absences, the outcome of Travis's interference claims turns on whether he was entitled to FMLA leave for those absences.  *See Rice v. Sunrise Express, Inc.*, 209 F.3d 1008, 1018 (7th Cir. 2000).

Employers may establish "usual and customary notice and procedural requirements" with which employees must comply to receive FMLA leave.  29 C.F.R. §§ 825.302(d), 825.303(c).  An employee's failure to comply with an employer's leave policies and procedures is a sufficient ground for denying FMLA leave requests.  *Righi v. SMC Corp.*, 632 F.3d 404, 411 (7th Cir. 2011).  Employers may also request certification by the employee's healthcare provider, which the employee must provide "in a timely manner."  29 U.S.C. § 2613(a); *see also* 29 C.F.R. § 825.305(b) (discussing timing of employee's provision of medical certification).

At the same time, the employer must "advise an employee whenever the employer finds a certification incomplete or insufficient, and shall state in writing what additional information is necessary to make the certification complete and sufficient."  29 C.F.R. § 825.305(c).  If the employee fails to provide sufficient certification, the employer must allow the employee to cure the deficiency.  *Hansen v. Fincantieri Marine Grp. LLC*, 763 F.3d 832, 837 (7th Cir. 2014).  If the employee fails to provide complete and sufficient certification after an opportunity to cure the deficiency, however, the employer may then deny an FMLA request.  *Id.*; 29 C.F.R. § 825.305(d).

### B. Failure to Recognize the March Absences as FMLA Leave

Travis claims that the City interfered with his rights by ultimately failing to approve his absences on March 11, 12 and 13, 2013, under the FMLA.  In opposing the City's motion for summary judgment, Travis principally criticizes the City's purported, "unprecedented position" that because Travis had previously been approved for FMLA leave to care for his children's emotional needs, he was "precluded from using FMLA leave for any other purpose."  (*See* Pl.'s Br. Opp'n (dkt. #13) 23.)   This is a mischaracterization of the City's position.  Rather, the City's position is that: (1) Travis could not use his previously-approved FMLA leave to care for his children's emotional needs for a purpose for which it had not been approved; and (2) Travis did not comply with the City's procedures in requesting FMLA leave for the new purpose of caring for his daughter's ankle injury, despite being repeatedly reminded of his obligation to do so before leave would be granted.

Travis also argues at some length that he gave the City sufficient notice of his desire for and entitlement to FMLA leave for each of the three March absences.  (Pl.'s Br. Opp'n (dkt. # 13) 11-13.)   This argument has slightly more traction, since Travis undoubtedly gave the City "sufficient information for [the City] to reasonably determine whether the FMLA may apply to the leave request."  29 C.F.R. § 825.303(b).  At least according to the City, however, Travis did *not* comply with the City's "usual and customary procedures" for applying for leave.  29 C.F.R. § 825.303(c).  Worse, Travis certainly knew *how* to apply for leave consistent with the City's procedures, having done so on numerous occasions in the past.

As noted above, even in the case of unforeseeable FMLA leave, the failure to comply with an employer's usual and customary procedures can provide sufficient basis to deny an FMLA leave request, absent unusual circumstances. *Righi*, 632 F.3d at 411; 29 C.F.R. § 825.303(c). Indeed, the Seventh Circuit rejected a similar employee's FMLA-interference claim in part because the employee failed to follow his employer's "written policy requiring its employees to obtain approval for leave from their supervisors." *Righi*, 632 F.3d at 411. In doing so, the court reiterated its previous holding "that an employee's failure to comply with his employer's internal leave policies and procedures is a sufficient ground for termination and forecloses an FMLA claim." *Id.* at 411-12 (citing *Brown*, 622 F.3d at 689–90; *Ridings*, 537 F.3d at 769 n.3, 771; *Lewis v. Holsum of Fort Wayne, Inc.*, 278 F.3d 706, 710 (7th Cir. 2002); *Gilliam*, 233 F.3d at 971). Accordingly, the Seventh Circuit concluded, "Righi's failure to follow the applicable regulatory and workplace requirements for notifying his employer of the expected duration of his leave forecloses his FMLA interference claim." *Id.* at 412.

Admittedly, *Righi* dealt with regulations governing *foreseeable* FMLA leave, but the regulations governing *unforeseeable* leave have contained comparable language effective since 2009. *See* The Family and Medical Leave Act of 1993, 73 Fed. Reg. 2862-02 (Nov. 17, 2008) (to be codified at 29 C.F.R. § 825.303). Thus, the crucial question becomes: (1) whether Travis complied with the City's usual and customary procedures in requesting leave; and (2) if he did not, whether "unusual circumstances" justified his non-compliance.

14

As to the first question, Travis contends that he *did* comply with the City's procedures by informing his supervisor that he would be absent from work to care for his daughter and, thereafter, submitting the doctor's note and certification regarding each absence related to his daughter's fractured ankle.  In turn, the City disputes this characterization, maintaining that its procedures mandate a written, formal application. As to this concern, most of the evidence is on the City's side.  Travis does not dispute that he was previously required to submit a formal application when applying for FMLA leave.  He also does not dispute that the City sent him a letter as recently as February 11, 2013, informing him that it had received his medical certification with respect to different absences, but that he needed to complete the Family and Medical leave application for that certification.  (*See* Leifer Aff. Ex. E (dkt. #11-5).)

Even so, the City presents no evidence of a clear written policy: its evidence is based on the declaration of Brad Wirtz, Human Resources Director for the City, who contends that the City has established procedures that "must be followed," including a mandatory "City FMLA application."  (Wirtz Decl. (dkt. #21) ¶¶ 2-3.)  The court certainly does not discredit this affidavit; however, the failure to produce, for example, an employee handbook or evidence of other employees who were required to submit a formal application under similar circumstances, does call into question whether these procedures were actually "usual and customary."

Of course, the absence of an employee handbook or some evidence clearly delineating the policy does not mean the policy did not exist, and so ordinarily the City's reliance on an affidavit alone would not necessarily be problematic.  However, Travis also

points out that:  he was absent on March 18, 2013; he did not submit a formal application; and, nevertheless, he was not disciplined for that absence.  (Def.'s Resp. PSPFOF (dkt. #18) ¶ 17.)  Moreover, the City's database for that absence includes an entry reading: "corrected from 310, corrected from no FMLA."  (*Id.*)  Finally, the certification of sick days used, signed both by Travis and his supervisor, describes the March 18 absence as "FMLA-C."  (Dkt. #16-2.)

The City explains that the lack of discipline for the March 18 absence is because between March 11 and March 18, Travis accrued 4.0 hours of new sick time, all of which was then applied to the March 18 absence.  As a result, Travis was not considered absent without permission.  The City also maintains that Travis did *not* receive FMLA leave for the March 18 absence.  While the City's explanation is plausible, the parties' evidence essentially comes down to a swearing contest between Travis and James Lehman, the Madison Metro Transit General Operations Supervisor, requiring a credibility determination that only a reasonable trier of fact can resolve.

Assuming the trier of fact finds Travis more credible, at least on this issue, it could also reasonably find that Travis *did* comply with the City's "usual and customary" procedures.  Similarly, if he is able to convince a jury that he was able to acquire the protections of the FMLA on other occasions, including on March 18th, merely by notifying his supervisor and submitting a certification of sick days used, even the requirement of a formal application on other occasions does not necessarily establish that a formal application was *always* required.  If any or all of these findings go against the City, then a reasonable jury might conclude that the City's policies were applied more

loosely than Wirtz states in his affidavit and that Travis, by providing the certification and UW Health letter, had complied with those policies.[9]

All this may be moot, however, if the City informed Travis, even after the fact, that he needed to submit the formal application and that doing so would result in the erasure of any discipline based on his March 2013 absences.  Then Travis has no excuse (or at least has presented none to this court) for his failure to take the final step to cure any deficiency in his application, since the alleged "interference" by the City would have caused him no prejudice -- rather, his own obstinance and inaction would have caused it. *See Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 89 (2002) (FMLA provides for no relief "unless the employee has been prejudiced by the violation"); *cf. Ridings* 537 F.3d at 766 (employee's failure to turn in FMLA forms was "entirely unrelated" to employer's mistake on those forms, and so employee was not excused from complying with FMLA obligations).

Unfortunately, the City has not presented a copy of a letter comparable to the one it sent on February 11, requesting that Travis submit the formal application form.  On the contrary, the only letter in the record addressing the March 11, 12 and 13 absences makes *no* reference to the need to submit a formal application.  Instead, that letter only refers to Travis's explanation in his AWOP meeting that his March absences were for reasons other than those which qualified him for leave and that they would, therefore,

---

[9] The City also relies on case law indicating that leave is only available for the purpose specifically approved.  These cases do not necessarily eliminate all ambiguity on this point -- or at least this court is not ready to so conclude -- on the limited record available to it on summary judgment, especially in the absence of proof of an established policy requiring formal application for leave to care for a child based on new physical need, rather than an approved psychological need.

remain uncovered by FMLA.  (Leifer Aff. Ex. Q (dkt. #11-17).)  Travis also affirmatively avers that at no time after May 1, 2013, did the City inform him that he needed to submit a formal application form -- again a sworn statement the court must credit at summary judgment.

In fairness, the City maintains that plaintiff *was* informed at the May 1 meeting of the need for him to cure his deficient FMLA request by submitting the formal application.  (*See* Def.'s Resp. PSPFOF (dkt. #18) ¶ 14.)  Moreover, plaintiff's proposed finding of fact at least leaves open the possibility that this is so, since he indicates that at no time *after* May 1 was he informed of an opportunity to complete the formal FMLA application.  (*See id.* at ¶ 15.)  But Travis also proposes as a finding of fact that at the May 1 meeting, he was informed "that FMLA leave would *not* be granted for these absences on March 11-13, 2013, and that he would be disciplined for absenteeism." (Pl.'s SPFOF (dkt. #15) ¶ 14 (emphasis added).)  Crediting this finding, it would make little sense to infer that Travis was nevertheless offered an opportunity to cure at the May 1 meeting.  Regardless, Travis is entitled to the opposite inference on summary judgment.

In light of the above, the court need not consider Travis's alternative arguments that (1) the City needed to provide him fifteen days to cure his deficient *medical certification* pursuant to 29 C.F.R. § 825.305 (an odd argument given that the City does not appear to challenge the adequacy of the certification (*see* Def.'s Br. Reply (dkt. #19) 7)); (2) the City needed to notify him of his eligibility to take FMLA leave within five business days under 29 C.F.R. § 825.300(b)(1); or (3) Travis's belief that a formal

application was not required was itself an "unusual circumstance." Crediting all of Travis's evidence, the court finds that a reasonable jury could conclude that: Travis complied with the City's usual procedures; he was never told otherwise; and the discipline he received for his absences between March 11 and 13 constituted an interference with his FMLA rights.

Of course, the City may be able to introduce evidence undermining this position -- for instance, if it can establish that its policies *actually* required the formal application, that Travis's March 18 absence was *not* treated like FMLA leave or that it gave him the chance to expunge the discipline from his work record -- but on this record, the court cannot resolve those questions as a matter of law. Accordingly, the motion for summary judgment with respect to this interference claim must be denied.

### C. Failure to Recognize the Summer Absences as FMLA Leave

Travis's second interference claim relates to the City's handling of his May 1, 2013, applications for personal leave and for leave to care for his children. As noted above, it is undisputed that Travis failed to recertify his leave by June 29, 2013, and that he was absent from work five times during July and August to care for the emotional needs of his children. The question is whether a reasonable jury could conclude he was nevertheless entitled to leave during that period, such that the City interfered with that entitlement by firing him.

Travis first contends that under the governing regulations, the City was not allowed to request recertification by June 29, 2013. Generally, an employer may request recertification "no more often than every 30 days and only in connection with an absence

by the employee."[10]  29 C.F.R. § 825.308(a).  Travis, however, relies on the exception to that general rule contained in 29 C.F.R. § 825.308(b).  That section provides: "If the medical certification indicates that the minimum *duration of the condition* is more than 30 days, an employer must wait until that minimum duration expires before requesting a recertification[.]"  *Id.* (emphasis added).  Dr. Plumb, who certified the medical basis for Travis's May 1 FMLA request, stated that the expected duration of the qualifying condition -- Travis's partner's illness -- was "terminal."  (Leifer Aff. Ex. L (dkt. #11-12) 4.)  Thus, the certification did not indicate that the "minimum duration of the condition is more than 30 days," which would trigger the employer's duty to wait until the expiration of the minimum duration under Section 825.308(b).  Because Dr. Plumb could not (or at least did not) make clear the expected duration of the *condition* on which Travis's leave was premised, the City could require Travis to recertify his leave by June 29, 2013, sixty days after the leave took effect.

Travis contends that the City improperly required recertification on June 29, 2013, as the medical certification form called for "6 months" as the "[e]xpected [d]uration of [l]eave."  (Leifer Aff. Ex. L (dkt. #11-12) 3.)  The regulations, however, specifically direct attention to the "duration of the *condition*" when determining the employer's ability to request recertification.  29 C.F.R. § 825.308(b) (emphasis added).

---

[10] This provision seems an ill fit in this case, where at the outset the City requested recertification on the last date that intermittent leave was in effect, rather than "in connection with an absence" by Travis.  Rather, this seems more like an instance of leave *expiring*, with Travis having the option to apply for an extension via recertification.  *See* 29 C.F.R. § 825.308(c)(1) (employer can request recertification in less than 30 days if "employee requests an extension of leave").  Assuming this provision is inapplicable, however, then the situation facing the court is simply that Travis's leave expired on June 29 and he failed to take any steps to comply with the City's policies and procedures to acquire additional protected FMLA leave.

Travis was granted leave premised on his partner's illness, for which Dr. Plumb could provide no clear end date, and that illness's effect on his children.   It was not unreasonable for the City to seek recertification sixty days later to assess the need for ongoing intermittent leave in light of the uncertain duration of Travis's partner's condition, which triggered the approved FMLA leave.   *Cf. Ridings*, 537 F.3d at 772 ("Riverside was permitted by the FMLA to require Ridings to substantiate her continued need for a reduced schedule[.]"); *Gilliam*, 233 F.3d at 972 ("Nothing in the FMLA or the implementing regulations prevents an employer from enforcing a rule requiring employees on FMLA leave to keep the employer informed about the employee's plans.").

In the alternative, Travis contends that he did not recertify before June 29, 2013, because the approval letter provided that his leave extended until June 29, 2014. Unsurprisingly, the City responds by arguing that the 2014 date was an obvious error; that the later letter corrected that date; and that regardless, the City informed Travis multiple times he had to recertify by June 29, 2013, even if the leave was in effect until 2014.   In reply, Travis essentially argues he should be excused on equitable grounds, though Travis's briefing does not attempt to establish the elements of equitable estoppel. Basically, Travis seems to contend that the City *misled* him by saying his leave request was approved through June 29, 2014, and that he relied on the City's apparent approval to his detriment.   *See Dormeyer v. Comerica Bank-Ill.*, 223 F.3d 579, 582 (7th Cir. 2000) ("[A]n employer who by his silence misled an employee concerning the employee's entitlement to family leave might, if the employee reasonably relied and was harmed as a result, be estopped to plead the defense of ineligibility to the employee's claim of

entitlement to family leave."). A party may be estopped from pursuing a claim or defense where: (1) the party to be estopped makes a misrepresentation of fact to the other party with reason to believe that the other party will rely upon it; (2) the other party reasonably relies upon that misrepresentation; and (3) the other party suffers a detriment as a result of his or her reliance. *Heckler v. Cmty. Health Servs. of Crawford Cnty., Inc.*, 467 U.S. 51, 59 (1984) (citing Restatement (Second) of Torts § 894 (1979)). Whether equitable estoppel applies in a given case is a question of fact. *Kosakow v. New Rochelle Radiology Assocs., P.C.*, 274 F.3d 706, 725 (2d Cir. 2001).

According to Travis, he relied on the "typo" in the original letter when deciding not to recertify the medical basis for his FMLA request to care for his children. (Pl.'s Br. (dkt. # 13) 19-20.) The issue, then, is whether a reasonable factfinder could conclude that Travis *reasonably* relied on the June 29, 2014, date in the letter approving his leave request. *See Anderson*, 477 U.S. at 248. Furthermore, "without reliance both actual and reasonable, there can be no finding of equitable estoppel." *Rager v. Dade Behring, Inc.*, 210 F.3d 776, 779 (7th Cir. 2000). Said another way, Travis must adduce some evidence from which a reasonable factfinder could infer that *he* would have done things differently had he not been misinformed about his FMLA entitlement. *See Weidner v. Unity Health Plans Ins. Corp.*, 606 F. Supp. 2d 949, 957-58 (W.D. Wis. 2009).

The court concludes that equitable estoppel does not bar the City's defense based on Travis's failure to recertify, despite the typographical error in the approval letter. *First,* the approval letter also stated that Travis was required to recertify by June 29, 2013 -- a requirement he apparently disregarded. (Leifer Aff. Ex. O (dkt. #11-15).) *Second*, the

City issued a letter one week later clarifying that its approval of Travis's FMLA request would be effective "until June 30, 2013." (*Id.* at Ex. Q (dkt. #11-17).)  Therefore, in multiple correspondences with the City, the June 29, 2013, recertification date was "there, staring [Travis] in the face." *Level 3 Commc'ns, Inc. v. Fed. Ins. Co.*, 168 F.3d 956, 959 (7th Cir. 1999).  Travis has not presented any evidence that he did not receive the clarification letter or understand its contents, and he does not explain why a reasonable person would feel free to disregard the June 29, 2013 recertification date -- even in light of the erroneous suggestion that leave was "in effect" until a year later.  Even presuming he has demonstrated *actual* reliance, no reasonable jury could conclude that Travis *reasonably* relied on the June 29, 2014, date, in assuming *all* references to June of 20*13* (including the recertification dates in the first letter and the date in the second "corrected" letter) were typographical errors. *See Anderson*, 477 U.S. at 248.

    The final question is whether the City interfered with Travis's rights by failing to notify him within five business days of his eligibility to take FMLA leave. *See* 29 C.F.R. § 825.300(b).  It is undisputed that Travis submitted Certification of Sick Days Used forms for his July and August absences, categorizing them as "FMLA-D" (with "D" standing for "dependent").  At no point before Travis's termination did the City inform him that those absences were not covered by the FMLA.  The court has already concluded that the undisputed facts show Travis's leave expired as of June 29, 2013, when he failed to request an extension via recertification.  Likewise, the court has concluded that a reasonable factfinder could find that such a "certification of sick days" is enough to comply with the City's customs as regards requesting FMLA leave.

In light of those conclusions, the court believes that Travis can survive summary judgment on his second interference claim.  Basically, the City cannot have it both ways by: (1) relying on the expiration of Travis's approved leave period to demonstrate that he was not entitled to the protections of the FMLA; and (2) contending that notice of Travis's eligibility given during the expired period is enough to comply with their notification duties surrounding an *entirely new period of leave.*  Said another way, the City was well aware that Travis's leave to care for his children expired in June of 2013 -- indeed, *the City itself* set that date.  Thus, when he submitted sick day certifications indicating a need to care for his children, which could qualify for FMLA leave, the City should have "notif[ied] the employee of the employee's eligibility to take FMLA leave within five business days, absent extenuating circumstances."  29 C.F.R. § 825.300(b)(1).  A reasonable factfinder could likewise conclude that, had the City given Travis notice that his absences qualified for FMLA leave, he would then have taken the steps necessary to benefit from its protections -- particularly given that he actually complied with such requests on multiple previous occasions, including by recertifying leave to care for his own mental health.[11]  Accordingly, Travis is entitled to have the trier of fact determine whether the City interfered with his rights (and thereby caused him prejudice) by failing to provide him with notice of his potential eligibility for leave in July and August.

---

[11] Of course, the City is welcome to argue that evidence of Travis's multiple other *failures* to comply supports a finding that he would *not* have complied, even with proper and timely notice.

## II.    Retaliation

Finally, Travis also claims that the City retaliated against him for exercising his rights under the FMLA in violation of 29 U.S.C. §§ 2615(a) and (b).  *See Kauffman v. Fed. Exp. Corp.*, 426 F.3d 880, 884 (7th Cir. 2005) ("We have construed [§§ 2615(a)(2) and (b)] to create a cause of action for retaliation.")   The FMLA affords protection to employees who suffer adverse employment actions because they have exercised rights protected by the Act.  *Lewis v. Sch. Dist. #70*, 523 F.3d 730, 741 (7th Cir. 2008). Allegations of wrongful termination can implicate both retaliation and interference theories; the difference is that retaliation "requires proof of discriminatory or retaliatory intent while [interference] requires only proof that the employer denied the employee his or her entitlements under the Act."  *Kauffman*, 426 F.3d at 884; *see also King v. Preferred Technical Grp.*, 166 F.3d 887, 891 (7th Cir. 1999).

To survive summary judgment on a retaliation theory, Travis must present evidence of intentional discrimination based on his exercise of his FMLA rights.  *Scruggs v. Carrier Corp.*, 688 F.3d 821, 827 (7th Cir. 2012).  Courts evaluate a claim of FMLA retaliation the same way as claims for retaliation under other employment statutes.[12]

---

[12] The standard of proof for causation required for FMLA retaliation claims is far less clear.  As this court has previously explained, legal authority on this question is scarce.  *See Nigh v. Sch. Dist. of Mellen*, 50 F. Supp. 3d 1034 (W.D. Wis. 2014).  In the present case, however, the parties agree that the court should apply the higher "but-for" standard.  (*See* Def.'s Br. (dkt. # 9) 11; Pl.'s Br. Opp'n (dkt. # 13) 22).  The court declines to delve further into this question because Travis's retaliation claim does not survive summary judgment.  *See Malin v. Hospira, Inc.*, 762 F.3d 552, 562 n.3 (7th Cir. 2014) (declining to address "whether but-for causation should apply to FMLA retaliation claims in light of *Gross* [*v. FBL Financial Services, Inc.*, 557 U.S. 167 (2009)] and [*University of Texas Southwest Medical Center v.*] *Nassar*[, -- U.S. --, 133 S. Ct. 2517 (2013)]" because the parties did not brief the issue and because the plaintiff could avoid summary judgment even if but-for causation applied to her retaliation claim).

*Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 503 (7th Cir. 2004).  To prove retaliation, Travis may proceed under either the direct or indirect methods of proof.  *Id.*

Travis's retaliation claims are essentially a reformulation of his interference claims, and they are ill-suited to that framework.  *Kauffman* is instructive on this point.  In *Kauffman*, the plaintiff had accumulated two disciplinary strikes; the employer's policy permitted termination after three strikes in a twelve-month period.  426 F.3d at 882.  He then missed three days of work.  After his return, his supervisor recommended that he apply for FMLA leave.  *Id.*  Qualifying for FMLA leave was "critical," since without it Kauffman would earn his third strike.  *Id.*  After turning in the requested certification, Kauffman's supervisor asked him for a completed copy.  When he did not have it on hand, the supervisor fired him on the spot for an untimely leave request.  *Id.*  Kauffman appealed internally, during which time the company abandoned the "untimely" rationale and asserted that the certification was actually inadequate.  *Id.* at 882-83.  The district court ultimately granted summary judgment in the employer's favor.  *Id.* at 884.

On appeal, the Seventh Circuit "first clarif[ied] that Kauffman's case is really about interference with his substantive rights, not discrimination or retaliation."  *Id.* at 884.  After acknowledging that a claim for wrongful termination can be brought under either a retaliation or interference theory, it pointed out that Kauffman had "point[ed] to no evidence of discriminatory or retaliatory animus."  *Id.* at 885.  He did not contend that his managers had attempted to "punish him for exercising rights or opposing an unlawful procedure; they did not even treat him differently than someone not entitled to FMLA leave."  *Id.*  When focusing on the "proper inquiry[,] . . . *i.e.,* whether FedEx

'respected' Kauffman's 'entitlements,'" the Seventh Circuit held that Kauffman had produced enough evidence to survive summary judgment on his interference claim:  the timeliness argument was "frivolous," and the doctor's certification had provided enough information to satisfy the FMLA.  *See id.* at 885-87.

Like the claim at issue in *Kauffman*, Travis's claim "is really about interference with his substantive rights, not discrimination or retaliation."  *Id.*  His theory is that he was entitled to FMLA leave but that the City refused to grant him that leave based on his purported failure to submit the proper documentation.  This is nearly identical to the claim in *Kauffman*, which the Seventh Circuit concluded was properly characterized as an interference claim.   Said another way, it presents a question of whether Travis was entitled to leave and, if so, whether the City respected that entitlement.  *See Kauffman*, 426 F.3d at 885 (citing *Diaz v. Fort Wayne Foundry Corp.*, 131 F.3d 711, 713 (7th Cir. 1997)).  Certainly, *Kauffman* does not hold that this fact pattern can *never* give rise to a retaliation claim; indeed, the court expressly recognized that a wrongful termination claim can be brought under a retaliation theory as well as an interference theory. Because of the factual similarity between *Kauffman* and the present case, however, it seems more appropriate for Travis's claim to proceed as one for interference with his FMLA rights.

Regardless, Travis has failed to present *any* evidence of discriminatory animus.[13] *See Kauffman,* 426 F.3d at 885 (no retaliation claim where employee was fired "*in spite of*

---

[13] Technically, Travis's claim appears to fit the framework of the direct method, which requires him to prove that (1) he engaged in protected activity; (2) the City took adverse action against him; and (3) there is a causal connection between the two.  *Caskey*, 535 F.3d at 593.  Assuming

his rights under the FMLA, not *because* he asserted those rights") (emphasis in original); *cf. Burnett*, 472 F.3d at 481-82 (retaliation claim survived summary judgment where employee was fired for "insubordination," and "alleged insubordinate act *was* his request for FMLA leave") (emphasis in original).   There are no "ambiguous statements, suspicious timing, [or] discrimination against other employees" in the record to support an inference of retaliatory animus.  *See Sylvester v. SOS Children's Vills. Ill., Inc.*, 453 F.3d 900, 903 (7th Cir. 2006).  If anything, this record shows that the City repeatedly *granted* Travis's requests for FMLA leave so long as he provided the required documentation, and Travis points to nothing suggesting that the City expressed frustration with Travis's exercise of leave or tended to discriminate against others who exercised their FMLA rights.   In the end, Travis "merely rel[ies] on conclusory pleadings" to support his retaliation claim, speculating that the City devised a scheme to terminate his employment because of his history of FMLA requests.  *Colan*, 812 F.2d at 361; *see also* Compl. (dkt. #1) ¶¶ 22-23; Pl.'s Br. Opp'n (dkt. #13) 22-24.  Such speculation without

---

Travis's position that his activity was protected (despite his alleged non-compliance with the City's FMLA procedures) is correct, the causal connection is conceded: there is no dispute that Travis was terminated because of the absences.  But to conclude that this alone is enough to create a triable retaliation claim runs contrary to *Kauffman*, which presented factual circumstances that mirrored these and found that the appropriate inquiry was whether the employer had interfered with the plaintiff's rights.  Like the plaintiff in *Kauffman*, Travis contends his absences were protected and the City disagrees; that is the sole basis of disagreement between the parties, who agree that Travis was terminated because he was absent.  *Cf. Kauffman*, 426 F.3d at 885 (it was "undisputed that FedEx fired Kauffman because he was absent").  Thus, as did the *Kauffman* court, the court relies on (1) the parties' dispute as to the "narrow question of [Travis's] entitlement to FMLA leave" and (2) the lack of evidence of animus in determining that this case does not fit the rubric of retaliation.

supporting evidence is not sufficient to survive summary judgment.[14]  *Colan*, 812 F.2d at 361.

His proposed retaliation claim also fails under the indirect method.  Travis "must establish a *prima facie* case by proving that [he] (1) engaged in a statutorily protected activity; (2) met [his] employer's legitimate expectations; (3) suffered an adverse employment action; and (4) was treated less favorably than similarly situated employees who did not engage in statutorily protected activity."  *Caskey*, 535 F.3d at 593 (citing *Nichols v. S. Ill. Univ.-Edwardsville*, 510 F.3d 772, 784-85 (7th Cir. 2007)).  Again, it is undisputed that seeking FMLA leave is a protected activity and that suspension and termination are adverse actions.  Even if the court assumes that Travis met the City's "legitimate expectations" and did, in fact, follow "proper procedures" for requesting FMLA leave, he has failed to present any evidence that a similarly situated employee was treated more favorably.

In his brief, Travis states "[i]t is undisputed that similarly situated employees who exercised FMLA rights were not fired."  (Pl.'s Br. Opp'n (dkt. #13) 23.)  Travis offers no evidence to support this statement, nor can he rely on a conclusory statement itself to survive summary judgment where he has the burden of proof.  *Colan*, 812 F.2d at 361.  Moreover, this statement draws a comparison between Travis's situation and the wrong comparator group.  Travis does not present any evidence that he was treated "less

---

[14] Travis points to the City's supposed position that Travis could not use FMLA leave for any purpose other than to care for the emotional needs of his children, but as discussed above, the court has rejected his characterization of the City's argument.  Travis also appears to contend that the typo in the letter was deliberate -- a "deliberate keeping of Travis in the dark" until he was fired -- but there is no evidence to support that position either.

favorably" than an employee who also missed work but *did not claim FMLA leave*. *See Caskey*, 535 F.3d at 593 (employee must show he was treated less favorably than those who did *not engage in statutorily protected activity*). Rather, he contends that he was treated less favorably than other employees who *did* engage in statutorily protected activity, which would suggest that some other factor (rather than his exercise of his FMLA rights) played a role in his termination. Perhaps he intended to suggest that those others exercised their rights less frequently, and support an inference of animus in that way, but he again presented no evidence that this is so; indeed, he does not even indicate who those "other employees" are.

For these reasons, Travis has failed to present evidence to support his retaliation claims under either the direct or the indirect method. Accordingly, the court finds that summary judgment in favor of the City on that theory is warranted.

ORDER

IT IS ORDERED that defendant The City of Madison, Department of Transportation, Transit Division's motion for summary judgment (dkt. #8) is GRANTED IN PART and DENIED IN PART, consistent with the opinion above.

Entered this 6th day of May, 2015.

BY THE COURT:

/s/

_____
William M. Conley
District Judge

30